**Opinion issued December 2, 2021.**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-21-00299-CV**

———————————

## IN THE INTEREST OF A. J. A. A/K/A
## UNKNOWN FEMALE A/K/A A. A., A CHILD

———————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-04474J**

———————————

### MEMORANDUM OPINION

In this appeal, J.C.A. ("Father") challenges the trial court's final decree terminating his parental rights to his minor child, A.J.A. ("Annie"), based on the court's findings Father knowingly placed or knowingly allowed Annie to remain in conditions or surroundings which endangered her physical or emotional well-being and constructively abandoned Annie. TEX. FAM. CODE § 161.001(b)(1)(D) & (N).

Father argues there is legally and factually insufficient evidence to support the trial court's findings that (1) he engaged in one or more predicate acts requiring termination of his parental rights and (2) termination of his parental rights is in Annie's best interest. Father further contends the trial court abused its discretion by appointing the Texas Department of Family and Protective Services ("Department") as Annie's conservator. We affirm the trial court's decree of termination.[1]

## Background

On December 23, 2019, the Department filed an original petition for conservatorship and termination of parental rights for a child later identified as Annie. Annie, who was just shy of her second birthday, came into the Department's care after the Department received a report of neglectful supervision by Randon Johnson ("Johnson"). According to the report, Annie and a man named Harvey Loggin ("Loggin") were passengers in a car driven by Johnson on December 20, 2019. When law enforcement attempted to stop the car, Johnson fled the scene and led the officers on a highspeed car chase. After two or three miles, Johnson pulled over and let Loggin and Annie out of the car. Johnson continued to flee but was later arrested. The police, who were unable to determine Annie's identity, turned Annie over to the Department.

---

[1] For purposes of this appeal and ease of reference, the term "Department" also includes Harris County Child Protective Services.

The Department immediately began efforts to identify Annie and locate her family. Loggin, a friend of Johnson, told the Department he did not know Annie's mother, but he believed she and Johnson were dating. He also stated he believed the mother may be a "sex worker." Loggin claimed he had never met Annie before the night of the car chase, and he did not know her name.

The caseworker assigned to the case spoke to one of the arresting officers, but he informed her he was unable to obtain any identifying information from Johnson about Annie or her mother. Caseworkers also made multiple attempts to talk to Johnson on December 20, 2019, but they were unable to do so because he was still being processed at the jail. One of the officers on duty, however, spoke to Johnson on the caseworker's behalf. Johnson gave the officer the mother's first name[2] and provided a phone number where she could be reached. The officer relayed that information to a caseworker who then attempted to contact the mother by leaving detailed voicemail messages and sending text messages to the phone number provided. The caseworker's efforts to reach the mother at this phone number were unsuccessful. The mother did not respond.

On December 21, 2019, the caseworker was finally able to meet with Johnson. Johnson claimed that the mother, who he only knew by the nickname Aliyah, was getting kicked out of her apartment and he was just giving her and Annie a ride to a

---

[2] The first name Johnson provided was accurate.

3

friend's house. He also provided a name for the child. That same day, the caseworker took Annie to Texas Children's Medical Center to have her evaluated because Johnson had a "past history of indecent exposure and being a registered sex offender." No signs of abuse or sexual abuse were observed.

On December 21, 2019, after confirming with law enforcement that no one had reported Annie missing or filed a missing person's report for Annie, the Department placed Annie in foster care. Annie remained in the same placement from December 21, 2019 until trial in April 2021.

The Department finally was able to locate A.M.T. ("Mother") on January 7, 2020, the same day as Annie's 2nd birthday and 17 days after the Department had taken Annie under its care. The Department filed a first amended petition on January 14, 2020, correctly identifying Annie and naming Mother and Father as her parents.[3] Separately, on August 13, 2020, Mother entered a plea of guilty/nolo contendere on an offense of assault on a family member committed in July 2019, and she was sentenced to two days in jail.

In September 2020, the Department finally was able to locate Father. Father had been arrested on September 9, 2020, and charged with unlawful possession of a firearm by a felon and aggravated assault with a deadly weapon, to wit, a firearm,

---

[3]     On June 9, 2020, the Department filed a second amended petition, naming Johnson and Loggin as possible fathers. DNA tests later confirmed that Father was Annie's biological parent and the court formally adjudicated him as Annie's father.

4

both felonies. Three months later, on December 1, 2020, Father filed a general denial, and on December 10, 2020, the trial court signed an order formally adjudicating him as Annie's father.

Trial commenced on April 28, 2021. Four witnesses testified during the bench trial: (1) Father, (2) Annie's caseworker, Nancy Viera, (3) Mother, and (4) Annie's Child Advocate, Jennifer Saucer.[4]

## A. Father's Testimony

Father, who was still in jail on his pending felony charges, testified that he and Mother were living together with Mother's grandmother when Annie was born in January 2018. Father testified he was employed and taking care of Annie. Sometime thereafter, Father and Annie moved to Huntsville to live with Father's godbrother. According to Father, "everything was going well." Then at some point, Mother called and told him she needed to take Annie to get vaccinated. Father, who had returned to Houston to look for employment, gave Annie to Mother in October 2019 so that Mother could take Annie to get her shots and he "could be able to get a job and do everything [he] had to do." Father testified he had been caring for Annie and providing for her needs until this time. Father testified he never saw Annie again after Mother took her in October 2019. Although he tried to contact Mother by text,

---

[4] Saucer's brief testimony only addressed the termination of Mother's parental rights to Annie, not Father's rights.

5

he was not able to reach her and at some point, he realized that he had been "blocked" on social media. Not long afterward, Father received a text message from Mother informing him that Annie had been "taken" or "kidnapped."[5]

Father testified he contacted the police to report Annie's disappearance, but the police told him they could not do anything because he did not have enough information. He then told Mother to get the police involved because she knew the man who had taken Annie and had a description of the car he was driving. Mother later told Father the "police acted like they didn't want to help out."[6] Father testified he was staying with his godmother when Annie disappeared and indicated that Annie had previously lived there with him "before her mom came and took her from [him] saying that she was going to take her to the hospital" to get vaccinations.

According to Father, Mother told him Annie had been "snatched" by Johnson, who she described as some guy Father knew. Father denied knowing Johnson. According to Father, he looked up Johnson online and learned that Johnson was a

---

[5]     Although Father did not specify when he learned of Annie's disappearance, the record reflects Mother spoke to Father about Annie's whereabouts between December 20, 2019 and December 30, 2019.

[6]     The record reflects Mother told the Department she filed a police report on December 30, 2019; she testified at trial, however, that she made a report the day Annie disappeared, on December 20, 2019.

6

sex offender. Father stated he did not know Mother associated with "sex offenders." He just knew she had "boyfriends and that was it."[7]

Father explained he wanted to keep Annie with him because he did not want her around Mother's boyfriends. When asked what about Mother's boyfriends bothered him, Father testified, "I kind of know their demeanor and their mind frames because I am a male myself. So as far as a lot of things happening to young little girls, I declined everything she tried to do, as far as sleeping in the same bed with my daughter." He explained Annie does not sleep in her room alone and "like[s] to sleep with her parents." Father testified that he did not want another man to take care of Annie because it was his job. Father confirmed he felt he could be more protective than Mother around these men.

Father testified he did not know Annie was in the Department's care until the caseworker met with him at the jail in September 2020.[8] He confirmed he was willing to do services to get Annie back, but he had not been able to participate in any services due to his incarceration, and the ongoing Covid pandemic.

---

[7]   Father did not testify about the precise nature of Mother's relationships with these men. Loggin, the other occupant of the car on the day of Johnson's highspeed chase, told the Department he believed Mother and Johnson were dating and that Mother may be a "sex worker."

[8]   According to Nancy Viera, Annie's caseworker, between January 2020 and September 9, 2020, Father was homeless and "did not have any form of communication." The record is otherwise silent as to Father's whereabouts between January 2020 and September 9, 2020.

7

Father asked the court not to terminate his parental rights because he had not done anything wrong. He testified he wants to be a father to Annie after he is released and that he had provided for Annie before his "current situation." He testified that when he had possession of Annie, he always provided a safe, stable environment, fed, and clothed her. When asked about his pending felony charges, Father testified he does not know when he will be released, and that he had another court date on June 17, 2021.

**B.    Caseworker's Testimony**

Nancy Viera testified she had been Annie's caseworker since the Department obtained temporary custody of Annie in December 2019. Annie was three years old at the time of trial. According to Viera, Annie came into the Department's care because she was a passenger in a car involved in a highspeed police chase on December 20, 2019. At the time, the police had no information to identify the child or her mother.

Eventually, on January 7, 2020, the Department was able to locate Mother. Viera and her supervisor "went to the jail to visit with" Johnson, the driver, to see if he had any identifying information for the mother. He provided a phone number for a friend he believed might know the mother. Viera testified she and her supervisor called the new number Johnson provided and spoke to someone who was able to get them in contact with Mother on January 7, 2020—Annie's second birthday and 17

8

days after Annie came into the Department's care.[9]  According to Viera, the Department had been in contact with law enforcement during this 17-day period, and to her knowledge, no one had filed a missing person's report for Annie during that time.  Viera stated it was concerning that a very young child like Annie was missing for over two weeks, including over the Christmas holiday, without anyone reporting her missing.

A family service plan was created for Mother and ordered by the court.  Viera testified Mother was ordered to, among other things, maintain stable income and stable housing.  Mother's family service plan states that Department was concerned about allowing Annie to remain in Mother's care because Mother did not "understand the danger that [Annie] was in and [was] unable to understand the severity of the situation."  The Department was also worried Mother was unable to provide Annie "with a drug free home as she has stated that she smoked marijuana regularly" and Mother does not "have a strong support system as she stated that she did not alert anyone that her child was missing."  The record reflects Mother tested positive for marijuana while Annie was in the Department's care.

According to Viera, Mother cooperated with the Department, consistently visited with Annie and brought food, shoes, and toys during visits, and completed

---

[9]     The caseworker had attempted without success to contact Mother using a different phone number Johnson had provided.

many of her services, such as attending parenting classes and substance abuse counseling. Mother, however, had not been successfully discharged from individual counseling and although the Department had given Mother additional time to locate a place to live for herself and Annie, Mother had not found suitable housing.

Viera noted it was concerning that despite counseling, Mother gave different accounts of what happened to Annie on the day she came into the Department's care and changed her story from assessment to assessment. The Department also had concerns about Mother's ability to control her anger. Viera testified that although she submitted to a psychiatric evaluation, as required by the court, Mother contradicted herself during the evaluation and the evaluator felt Mother was not being honest. For example, Mother at some point stated that Annie was with a family friend on December 20, 2019, but during her psychological evaluation Mother said she was not concerned about Annie's safety because Father was in the car with the child. Viera testified that according to the police report, Father was not in the car when police attempted to pull Johnson over. Although Mother allegedly told Father that Annie had been kidnapped, Mother never told the Department Annie had been kidnapped. Mother did, however, state during her evaluation that the Department was involved because her "friend" kidnapped her daughter. Viera testified that, to her knowledge, the police never received a kidnapping report.

Viera testified that although the Department initially wanted to reunite Annie with Mother, the goal changed to unrelated adoption, with a concurrent goal of unrelated conservatorship in March 2021 because despite giving Mother additional time, Mother had not found suitable housing and she had inconsistent work history. Viera further testified, "It's also concerning that the reason why the child came into care originally has not been addressed during this time, even though [Mother] has been in individual counseling since August of last year."

Viera testified that Mother identified two potential placements, including Annie's paternal grandfather's girlfriend and Annie's maternal great grandmother. The Department completed home studies for both possible placements but denied both studies. Viera testified she never considered Annie's maternal grandmother as a potential placement because Annie, Mother, and Father were living with her when Mother was arrested for assaulting a family member in July 2019, for which she plead guilty/nolo contendere. According to Viera, Annie's grandmother kicked Annie and Father out of her apartment after Mother's arrest even though she knew Father and Annie "would be left homeless." The record reflects Mother was also convicted of theft in 2014 and criminal trespass in 2017.

The Department, which made numerous attempts to contact Father, was able to locate him at the Harris County jail in September 2020. According to Viera, the Department had previously sent certified letters to Father's family members,

including his mother.  Father told Viera that his mother was homeless and that he had also been homeless for a time and "did not have any form of communication."

Viera acknowledged Father was currently charged with unlawful possession of a firearm by a felon and aggravated assault with a deadly weapon.  Exhibits admitted during the trial reflect that both charges were felony offenses committed on September 9, 2020, and Father had a previous felony conviction for unauthorized use of a motor vehicle in 2014.  The record reflects Father also had five misdemeanor charges prior to Annie's birth, all of which were for non-violent offenses, including criminal trespass, theft, criminal mischief, and marijuana possession. Notably, the record reflects that Father's criminal trespass offense was against the same property owner and on the same day as Mother's criminal trespass offense in 2017.

Viera testified that when she met with Father, he demonstrated a willingness to avail himself of services if they were available to him while in jail. She did not, however, make a request for services on his behalf because the Department could not find a provider that would provide him services, and as a result, it was impossible for him to complete any services prior to trial due to his incarceration.  She testified Father had not provided any support to Annie since she had been in the Department's

care[10] and there was no evidence he was able to provide her with a safe and stable home at that time.

Viera testified Father's conduct was not "the direct reason why [Annie] came into care." When asked if, based on the information available to her, Father had supported and provided for Annie whenever Mother told him where she was, Viera answered, "I would not be able to attest to that because I did not know him at the time, nor was able to observe his parental abilities with" Annie, but she also acknowledged that she had no information to the contrary. She also acknowledged that she had no evidence Father had neglected, abused, or jeopardized Annie. She also testified the March 2020 status hearing order stated that the "family plan of service" was ordered "as to the mother only."

Viera testified that Annie remained in the same foster home where she had been placed at the beginning of the case, and that her current placement was meeting all of Annie's physical and mental needs. While the current placement was not an adoptive placement, Viera testified the Department had found an adoptive placement that could meet all of Annie's needs. Viera acknowledge that Annie was not bonded with her prospective adoptive family.

---

[10]    Annie was in the Department's care for nine months prior to Father's arrest in September 2020.

## C. Mother's Testimony

Mother testified she was Annie's mother and that Annie was in the Department's care because Johnson had kidnapped her. According to Mother, Johnson picked her and Annie up at her boyfriend's house and was giving them a ride to another friend's home on December 20, 2019. Mother testified that she and Johnson got into an argument over gas money and when she got out of the car to get gasoline, Johnson drove off with Annie. Mother claimed she was unaware Johnson was a registered sex offender.

Mother also testified that Father, who was a friend of Johnson, was in the car with Annie when Johnson drove off and left her stranded. Mother acknowledged, however, that Father was not in Johnson's car when the police later attempted to pull the car over.[11] She claimed Father lied when he testified he did not know Johnson.

Mother testified that after Johnson left with Annie, she made a police report that same day and she was not sure why the police had no record of anybody reporting a child missing. In addition to the report, Mother testified she searched for Annie on her own, including contacting Father's relatives. She claimed the Department did not contact her after Annie was kidnapped, but instead, she contacted the Department on her own.

---

[11]   It is not clear from the record how much time transpired between the time Johnson drove off with Annie in the car and when the police attempted to stop the car.

The trial court entered a final judgment terminating Father's rights based on its findings Father knowingly placed or knowingly allowed Annie to remain in conditions or surroundings which endangered her physical or emotional well-being and constructively abandoned Annie. *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (N). The court also found that termination was in Annie's best interest and appointed the Department as sole managing conservator of Annie.[12]

## Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, we strictly scrutinize termination

---

[12] The trial court also terminated Mother's parental rights to Annie. Mother is not appealing the termination of her rights and she is not a party to this appeal.

proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.*

In a case to terminate parental rights under Texas Family Code section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362.

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we examine all evidence in the light most favorable to the finding, assuming the "factfinder resolved disputed facts in favor of its finding

16

if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266. We must also disregard all evidence that the factfinder could have reasonably disbelieved or found to not be credible. *Id.* But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

When conducing a factual sufficiency review in a termination case, we must consider the entire record. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We assume "that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266). We cannot "disregard" disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (quoting *In re J.F.C.*, 96 S.W.3d at 266). Rather, we must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or

17

conviction" that the finding was true. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

## Predicate Findings

In his first and second issues, Father argues there is legally and factually insufficient evidence supporting the trial court's findings he engaged in the predicate activities set forth in Texas Family Code Section 161.001(b)(1)(D) & (N). *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (N).

## A. Applicable Law – Section 161.001(b)(1)(D)

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that (1) the parent has engaged in at least one statutory predicate act and (2) termination is in the best interest of the child. *In re N.G.*, 577 S.W.3d 230, 230 (Tex. 2019); *see* TEX. FAM. CODE § 161.001(b). Under Section 161.001(b)(1)(D), parental rights may be terminated if clear and convincing evidence establishes the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(D). Subsection (D) concerns the child's living environment, rather than the parent's conduct, though parental conduct may produce an endangering environment. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

"Endanger," as used in Section 161.001(b)(1)(D) means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). An endangering environment may be created by the physical living conditions or by the conduct of a parent or other person in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home" under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

A child may be endangered when the home environment creates a potential for emotional or physical injury; it is not necessary that injurious conduct be directed at the child or that the child suffer actual injury. *Boyd*, 727 S.W.2d at 533. A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *In re M.R.J.M.*, 280 S.W.3d at 502. "A parent does not need to know for certain that the child is in an endangering environment—awareness of a potential for danger is sufficient." *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.) (citing *In re R.S.-T.*, 522 S.W.3d at 109). For purposes of proving endangerment under subsection (D), the relevant

19

period is before the Department removed the child. *In re R.S.-T.*, 522 S.W.3d at 108–09 (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). A termination pursuant to subsection (D) may be based upon only a single act or omission. *In re R.S.-T.*, 522 S.W.3d at 109.

## B. Analysis

The record reflects Father voluntarily left Annie in Mother's care in October 2019, even though he knew Mother associated with men he believed created an unsafe environment for Annie, as well as knowing Mother engaged in criminal activities involving illegal drug use and violence that jeopardized Annie's welfare. Specifically, when Father was asked if he knew Mother associated with sex offenders, Father responded: "No . . . I just know that [Mother] has boyfriends and that was it. And that's the reason I kept [Annie with] me. Because I told [Mother], if you're going to hang out with your boyfriends, leave her with me." Furthermore, when asked what about these men bothered him, Father testified:

> I kind of know their demeanor and their mind frames because I am a male myself. So as far as a lot of things happening to young little girls, I declined everything that she tried do, as far as sleeping in the same bed with my daughter. Because the way my daughter sleeps, she like[s] to sleep with her parents. She doesn't sleep in the room by herself.

Father's response could reasonably have indicated he was concerned Annie might be sleeping in the same bed as Mother and her partners, and therefore, be exposed

to inappropriate behavior. Father also testified he would be better able to protect Annie from these men than Mother.

Father was also aware Mother had engaged in criminal activity in the past, including criminal conduct that jeopardized Annie's emotional or physical well-being. Specifically, Mother, Father, and Annie were living with Mother's mother in July 2019 when Mother assaulted a family member. After Mother was arrested, her mother kicked Father and Annie out of the home, despite knowing they had nowhere else to live and would be homeless. Annie was only one and a half years old at the time. Notwithstanding, Father delivered Annie to Mother only three months later.

There is also evidence that both Mother and Father were convicted of criminal trespass for an offense that occurred on the same day and against the same person. A reasonable factfinder could have inferred from this evidence Father and Mother committed the offense together and therefore, Father was aware of Mother's past criminal conduct.

Mother also admitted to the Department that she used marijuana regularly. Illegal narcotics use may endanger children by rendering the parent too impaired to care for them and is accompanied by the possibility of prolonged and unplanned separation due to incarceration. *In re N.J.H.*, 575 S.W.3d at 831–32. Father, who had a prior conviction for marijuana possession, previously lived with Mother. A factfinder reasonably could have inferred from this evidence that Father was aware

21

of Mother's marijuana use when he left Annie with her in October 2019.[13] *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("Parental and caregiver illegal drug use . . . supports the conclusion that the children's surroundings endanger their physical or emotional well-being.").

Nevertheless, Father argues the evidence is insufficient to support a finding under Subsection (D) because there was no evidence he was "aware that when he let [M]other take the child for her vaccinations that she would not return the child and would place the child in a dangerous environment" and Annie's caseworker acknowledged that nothing [Father] did was the reason for [Annie's] coming into the care of the agency." It was not necessary, however, for Father to know for certain the danger to which Annie would be exposed. Only evidence demonstrating Father was aware of the potential for danger is necessary. *See In re I.N.D.*, 2020 WL 2441375, at *3 ("A parent does not need to know for certain that the child is in an endangering environment—awareness of a potential for danger is sufficient.") (citing *In re R.S.-T.*, 522 S.W.3d at 109). And contrary to Father's assertion, Viera did not testify that nothing Father did caused Annie to come into the Department's care. Rather, she testified that Father's conduct was not "the *direct reason*" Annie came into their care. (Emphasis added)

---

[13]     There was no testimony about Mother's drug use at trial, but her drug use was discussed in the permanency report admitted into evidence.

In addition to leaving Annie in Mother's care, there is also evidence Father endangered Annie by failing to protect her from the unsafe circumstances that brought her into the Department's care. It is undisputed Father was not in the car when the police attempted to pull Johnson over. Mother, however, testified that Father and Johnson were friends and that Father was in the car with Annie just before Johnson drove off with Annie and engaged on a high-speed chase on December 20, 2019. While Father claimed he did not know Johnson and testified Annie was not in his possession when she came into the Department's care, Mother testified Father was lying. As the trier of fact, the trial court could have credited Mother's testimony on this point over Father's and reasonably concluded that at some point prior to the police stopping Johnson, Father had been in the car with Annie, as Mother claimed. *See In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021) (stating appellate courts should defer to factfinder's determinations regarding witness credibility); *see also In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (noting it is within jury's province to judge parent's demeanor and to disbelieve his testimony that he did not know how child was injured).

There is also evidence Mother told Father that Annie had been "kidnapped" by Johnson, a registered sex offender, at some point between December 20, 2019,

the day Annie disappeared, and December 30, 2019.[14]  Father testified that his godbrother helped him report to police that Annie had been kidnapped and that he told Mother to contact the police because she had more information about Johnson and the car he was driving.  Viera, however, testified that the Department had been in contact with police and no one had reported Annie missing.  Viera also testified they had a difficult time locating Father until they found him in jail nine months later.

Mother knew Annie was in the Department's care by no later than January 7, 2019, when the Department finally was able to locate her.  Yet, despite having renewed contact with Mother, Father testified he did not know Annie was in the Department's care until Annie's caseworker visited him in jail in September 2020.  Other than Viera's testimony that Father had reported to her that he had been homeless and "did not have any form of communication," the record is otherwise silent as to Father's whereabouts during this time.  There is no evidence Father had been arrested or was confined prior to September 9, 2020.  A reasonable factfinder could have inferred from this evidence Father did not take adequate steps to find Annie after he learned in December 2019 that she had been kidnapped by a registered sex offender.

---

[14]     Mother told the Department she spoke with Father about Annie's whereabouts before she filed a police report on December 30, 2019.

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that Father knowingly placed or knowingly allowed Annie to remain in conditions or surroundings that endangered her physical or emotional well-being in violation of Section 161.001(b)(1)(D). *See In re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Father knowingly placed or knowingly allowed Annie to remain in conditions or surroundings that endangered her physical or emotional well-being in violation of Section 161.001(b)(1)(D). *In re J.F.C.*, 96 S.W.3d at 266; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

Because we conclude the evidence is legally and factually sufficient to support the trial court's finding under Section 161.001(b)(1)(D), we do not address Father's arguments that the evidence is legally and factually insufficient to support the trial court's finding under Section 161.001(b)(1)(N). *See In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

We overrule Father's first and second issues.

**Best Interest of Child**

In his third issue, Father argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of his parental rights was in Annie's best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

**A.     Applicable Law**

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the permanent placement of a child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 35 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking

custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We may also consider the statutory factors set forth in Texas Family Code Section 263.307, including: (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

This list of factors is not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best

interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

**B. Analysis**

Multiple factors support the trial court's finding that termination of Father's parental rights was in Annie's best interest, the first of which is Father's continued criminal conduct. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating intentional criminal activity that exposes parent to incarceration is conduct that endangers child's physical and emotional well-being).

28

The record reflects Father was convicted of five misdemeanor offenses prior to Annie's birth, all of which were for non-violent offenses, and one conviction for the felony offense of unauthorized use of a motor vehicle. While Annie was in the Department's care, Father was charged with unlawful possession of a firearm by a felon and aggravated assault with a deadly weapon, to wit, a firearm, both felonies. Father was in jail still awaiting trial on these felony charges at the time of the present trial in April 2021. Father, who was arrested in September 2020, had been absent from Annie's life for eleven months at the time of his arrest and fourteen months at the time of trial. And as he admitted at trial, he faced the likelihood of further confinement. *See Boyd*, 727 S.W.2d at 533 ("[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.").

Father argues that his prior criminal convictions do not pose a threat to Annie because they occurred before Annie was born and his pending felony charges were based on events that allegedly occurred after Annie came into the Department's care. This argument is not persuasive because a parent's criminal conduct—both before and after a child's birth—is relevant for purposes of determining whether termination of parental rights is in the child's best interest. *See re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) (concluding father's series of crimes occurring before and after children's births supported trial court's best-interest finding).

Father further contends there is no evidence that his pending felony charges pose a threat to Annie's well-being and that a pending criminal charge, in and of itself, is insufficient to support termination and a best-interest finding. The evidence in this case, however, consists of far more than just a pending criminal charge; the evidence reflects Father engaged in a course of continued criminal conduct both before and after Annie was born that not only caused him to be absent from Annie's life for a prolonged duration, but also subjected Father to the possibility of incarceration. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (noting evidence of parent's inability to maintain lifestyle free from arrests and incarcerations is relevant to best-interest determination); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (concluding that although criminal charges were ultimately dismissed, each time mother was jailed she was absent from child's life and unable to provide for child's physical and emotional needs).

The evidence supporting the trial court's finding that Father had "knowingly placed or knowingly allowed [Annie] to remain in conditions or surroundings which endanger[ed her] physical or emotional well-being" also support a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28. As discussed above, Father was aware Mother had multiple partners and he testified he did not want Annie to be around these men. Father was also aware Mother regularly

30

used marijuana and that she had been charged with assaulting a family member when Mother, Annie, and Father lived together with Annie's maternal grandmother. Despite being aware of these circumstances, Father voluntarily returned Annie to Mother's care, thereby subjecting Annie to potential danger. There was also evidence that at some point, Father had been in the car with Annie and Johnson when Johnson drove off with Annie. The record also indicates Father made inadequate attempts to locate Annie after Mother told him in late December 2019 that the child had been "kidnapped" by Johnson, a registered sex offender.

Father argues there is some evidence he was able to provide Annie "with a safe and stable home" prior to his incarceration. He points to his testimony and Viera's testimony admitting she had no evidence to the contrary. The record reflects, however, that Annie moved from one home to another with Father during the first two years of her life. Annie lived with her parents and maternal great-grandmother after she was born in January 2018. Later at some point, Annie and her parents moved in with Annie's maternal grandmother, but she kicked Annie and Father out of her apartment in July 2019, following Mother's arrest when Annie was only one and a half years old. From July 2019 until October 2019, Annie and Father presumably lived with Father's godbrother in Huntsville, although Father testified that he had returned to Houston at some point to look for work. Father testified that he and Annie were living with Father's godmother "before [Annie's] mom came and

31

took her from [him] saying that she was going to take [Annie] to the hospital" in October 2019. At that time, Father voluntarily returned Annie to Mother's care. The only evidence of Annie's residence between October 2019 and December 2019 is Johnson's statement to the Department that he was giving Mother and Annie a ride because they were being kicked out of their apartment. Thus, rather than demonstrating a stable homelife, the record reflects Annie was constantly moving from one relative's home to another.

Although Father testified that he supported Annie prior to his incarceration in September 2020, Viera testified Father had provided no support for Annie since she came into the Department's care in December 2019. Viera testified she had no evidence Father would be able to provide Annie with a safe and stable home after his release from jail.

Father made no attempts to interact or visit with Annie after his incarceration, even after learning that she was in the Department's care.[15] There was likewise no evidence to establish Annie was bonded with Father or wanted to be with him. Instead, the record reflects Annie, who was three years old at the time of trial, had been in the same foster home for over a year, since December 2019. Viera testified her placement had been able to meet all of Annie's physical and emotional needs.

---

[15]    Father learned Annie was in the Department's care in September 2020, at which point Father had not seen Annie for eleven months.

Although her current placement was not an adoptive placement, Viera explained the Department had located an adoptive placement that could meet Annie's physical and emotional needs. Annie's young age alone weighs in favor of the trial court's finding that termination was in Annie's best interest. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that young age of child—fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest); *see also In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969 *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (stating young ages of the children—five and six years old—rendered them vulnerable if left with parent unable or unwilling to protect them or attend to their needs).

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Father's parental rights was in Annie's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights was in Annie's best interest. *Id.*; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

We overrule Father's third issue.

## Conservatorship

In his fourth issue, Father argues the trial court erred and abused its discretion by naming the Department as Annie's sole managing conservator because the evidence supporting the finding required by Texas Family Code Section 153.131 is legally and factually insufficient.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.— Houston [1st Dist.] 2018, pet. denied). Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856. An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating his parental rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also In re J.D.G.*, 570 S.W.3d at 856.

Because we have overruled Father's challenges to the portion of the trial court's order terminating his parental rights, the order divested Father of his legal rights and duties related to Annie. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 855–56. Consequently, Father lacks standing to challenge the portion of the order appointing the Department as Annie's conservator. *See In re J.D.G.*, 570 S.W.3d at 856 (affirming termination of father's parental rights and holding that father, who had been divested of his legal rights to child, could not challenge conservatorship determination).

We overrule Father's fourth issue.

## Conclusion

We affirm the trial court's decree of termination.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Radack and Justices Rivas-Molloy and Guerra.